**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**MAY 26 2000**

**PATRICK FISHER**
**Clerk**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

TOSCO CORPORATION, a Nevada corporation,

    Plaintiff-Appellee,

v.

KOCH INDUSTRIES, INC., as successor to Rock
Island Oil & Refining Co., Inc., a Kansas corporation,

    Defendant-Appellant,

SUN COMPANY, INC., (R&M), a Pennsylvania,
corporation; ALPHA OIL COMPANY, an Oklahoma
corporation; RESOURCE RECOVERY COMPANY;
ENERGY REALTY INTERNATIONAL,

    Defendants.

No. 98-6209

---

Before **BRORBY, McWILLIAMS** and **HENRY**, Circuit Judges.

---

**ORDER ON REHEARING**

Koch Industries, Inc. ("Koch") has filed a petition for panel rehearing to
clarify factual statements in *Tosco Corp. v. Koch Indus., Inc.*, ___ F.3d ___, 2000
WL 525915 (10th Cir., May 2, 2000), concerning the district court's allocation of
fifteen percent of past and future response costs at the Duncan, Oklahoma
refinery to Koch.  Specifically, Koch seeks to clarify that the court did not

allocate fifteen percent of the response costs to Koch bases on the "relative

Proportion of time Koch operated the Refinery," *Tosco*, 2000 WL 525915 at *2,

but rather, on the relative period during which the Refinery was operated while

under Koch's ownership.

Upon consideration, the court grants the limited petition for rehearing. An

amended opinion is attached to this order.

**Entered by the Court:**

**WADE BRORBY**
United States Circuit Judge

**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**MAY 26 2000**

**PATRICK FISHER**
**Clerk**

**PUBLISH**

### UNITED STATES COURT OF APPEALS

### TENTH CIRCUIT

---

TOSCO CORPORATION, a Nevada corporation,

    Plaintiff-Appellee,

v.

KOCH INDUSTRIES, INC., as successor to Rock Island Oil & Refining Co., Inc., a Kansas corporation,

    Defendant-Appellant,

SUN COMPANY, INC., (R&M), a Pennsylvania, corporation; ALPHA OIL COMPANY, an Oklahoma corporation; RESOURCE RECOVERY COMPANY; ENERGY REALTY INTERNATIONAL,

    Defendants.

No. 98-6209

---

**Appeal from the United States District Court
for the Western District of Oklahoma
(D.C. No. CIV-95-556-M)**

---

John J. Lyons (Kathleen O'Prey Truman of Latham & Watkins, Los Angeles, California, and Robert N. Barnes of Barnes, Smith, Lewis & McCutcheon, P.C., Oklahoma City, Oklahoma, with him on the brief) of Latham & Watkins, Los Angeles, California, for Plaintiff-Appellee.

J. Kory Parkhurst (Thomas A. Loftus III of Koch Industries, Inc., Wichita, Kansas, and J. William Conger of Hartzog, Conger & Cason, Oklahoma City, Oklahoma, with him on the briefs) of Koch Industries, Inc., Wichita, Kansas, for Defendant-Appellant.

Before **BRORBY, McWILLIAMS** and **HENRY**, Circuit Judges.

---

**BRORBY**, Circuit Judge.

---

The United States District Court for the Western District of Oklahoma entered judgment in favor of Plaintiff, Tosco Corporation ("Tosco"), on its Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA") and Oklahoma nuisance law claims against Defendant, Koch Industries, Inc. ("Koch"). In so doing, the district court declared Koch responsible for its fair share (fifteen percent) of all past and future response costs and damages Tosco incurred or will incur while investigating and remediating environmental contamination at the abandoned Duncan, Oklahoma oil refinery ("Refinery"). Koch appeals, claiming the district court (1) erred in determining Koch to be liable under CERCLA; (2) applied an incorrect and inequitable cost allocation method; (3) erred in ruling Koch liable under Oklahoma nuisance law; (4) abused its discretion by admitting late-filed, untimely evidence; and (5) erred by not taking into consideration the settlement between Sun and Tosco. We consider each issue in turn, and affirm.

## I. Factual Background

<u>Ownership History</u>

The Refinery sits on approximately four hundred acres five miles south of Duncan, Oklahoma. Rock Island Refining Company built the northern and eastern portions of the Refinery (approximately 160 acres) in the 1920s, and expanded and modified those portions during the 1920s and 1930s. Rock Island Oil & Refining Company, an unrelated entity and Koch's predecessor company, purchased those portions of the Refinery as an ongoing refining business in September 1946. Koch operated the northern and eastern portions of the Refinery until December 1949, when it shut down operations.

In June 1951, Koch leased the northern and eastern portions of the Refinery to Sunray DX Oil Corporation ("Sunray"), predecessor-in-interest to Sun Company, Inc. ("Sun"). Sunray continued Koch's operation under lease from June 1951 to September 1953. In September 1953, Sunray purchased the northern and eastern portions of the Refinery from Koch and combined those portions with the southern and western portions of the Refinery it purchased in 1947 from the United States, Defense Plant Corporation, which had utilized the southern and western portions to produce jet fuel during World War II. Sunray and its successors owned and operated the Refinery from 1947 until 1980. Tosco

purchased the Refinery from Sun in November 1980, and operated it for three years until June 1983. The Refinery has not been in operation since that date.

Tosco sold the Refinery to Alpha Oil Company ("Alpha") in April 1986. Alpha then sold certain waste areas of the Refinery to Resource Recovery Company ("Resource Recovery") and the remaining areas to Energy Realty International ("Energy Realty") in the summer of 1986. Resource Recovery Company and Energy Realty International are the current owners of the Refinery.

Refinery Operations

Koch, Sun and Tosco each conducted oil refining operations at the Refinery. Koch manufactured gasoline, kerosene, distillate, naphtha, range oil, fuel oils, and asphalt products at the Refinery. During Sun's and Tosco's ownership, the Refinery manufactured automotive gasoline, diesel fuel, aviation fuel, various grades of fuel oil, LP gas, petrochemical feedstock, and petroleum coke. Koch's asphalt plant was shutdown after Sunray built the coker in 1954.

Refinery operations, including those during Koch's ownership and operation, generated various hazardous substances and wastes, including slop oil emulsion solids, heat exchanger bundle cleaning sludge, API separator sludge,

leaded tank bottoms, highly corrosive sludges, waste waters, and petroleum hydrocarbon byproducts. Koch operated numerous unlined waste ponds and pits, oil skimming ponds, sumps, settling ponds, cooling ponds, holding ponds, and drainage ditches, and an asphalt pit area and underground pipeline for waste disposal. These areas are probable sources of underground contamination. The pollution caused by the Refinery's various owners and operators commingled and cannot be separated.

Site Investigation and Remediation

The Oklahoma Department of Environmental Quality ("Department") completed an environmental investigation of the Refinery in 1994. The Department informed Tosco and Sun, as former owners of the Refinery, that further investigation and remedial action was necessary and requested that Tosco and Sun conduct such activity jointly. Only Tosco entered into a Consent Agreement and Final Order with the Department, under which Tosco agreed to complete a remedial investigation and feasibility study of the site, prepare a remedial design, and take certain interim remedial actions. Tosco has installed a cut-off wall and bank stabilization to remediate seeps of hydrocarbons and hazardous substances into Claridy Creek, and has operated a system to recover hydrocarbons and other hazardous substances floating on the groundwater under

the Refinery. At the time of trial, Tosco continued to work with the Department to investigate the need for further, future corrective actions. As of December 1, 1997, Tosco had incurred investigation and remediation costs of $755,868.23. Total costs are likely to exceed $2,000,000.

Litigation History

In June 1997, Tosco filed suit against Sun, Koch, Alpha, Resource Recovery and Energy Realty seeking contribution for past and future investigation and remediation costs pursuant to CERCLA § 113, 42 U.S.C. § 9613, Oklahoma public nuisance law, and other statutes. Tosco also sought relief against Sun for breach of contract and contractual declaratory relief, stemming from the purchase agreement through which Tosco purchased the Refinery from Sun. Sun settled all claims with Tosco in January 1998 after a one-day bench trial on the contractual issues. The remaining CERCLA and nuisance claims against Koch, Alpha, Resource Recovery and Energy Realty were tried to the court in February 1998. Koch was the only defendant that appeared and defended these remaining claims, as Alpha, Resource Recovery, and Energy Realty either no longer exist or are insolvent.

In March 1998, the district court found Koch liable under CERCLA and

Oklahoma public nuisance law and allocated nineteen percent of Tosco's past and future response costs to Koch. In September 1998, the district court amended its judgment by reducing the allocation of costs to Koch to fifteen percent, reflecting the relative period during which the Refinery was operated while under Koch's ownership. Koch appeals the amended judgment.

## II. Analysis

### A. CERCLA Liability

Pursuant to CERCLA's contribution provision, 42 U.S.C. § 9613(f), Tosco is entitled to recover response costs from any person who is liable or potentially liable under CERCLA § 107(a), 42 U.S.C. § 9607(a). *See United States v. Colorado & Eastern R.R.*, 50 F.3d 1530, 1535-36 (10th Cir. 1995). Section 107 imposes strict liability on four classes of potentially responsible persons, including current and former owners and operators of a facility or vessel involved in hazardous substance disposal, and persons who arranged for or accepted hazardous substances for disposal or transportation. 42 U.S.C. § 9607(a)(1)-(4). Prior owners or operators like Koch are responsible persons if they controlled the site "at the time of disposal" of a hazardous substance. *Id.* § 9607(a)(2). A "disposal" is "the discharge, deposit, injection, dumping, spilling, leaking, or placing of any ... hazardous waste into or on any land or water so that such ...

hazardous waste ... may enter the environment." *Id.* § 6903(3). The plaintiff in a CERCLA response cost recovery action involving multiple potentially responsible persons need not prove a specific causal link between costs incurred and an individual responsible person's waste. *United States v. Alcan Aluminum Corp.*, 964 F.2d 252, 264-66 (3d Cir. 1992). To establish liability under § 9613(f), it is sufficient for the plaintiff to establish a connection between a particular defendant and the incurred response costs *vis à vis* the defendant's identification as a responsible person as defined in § 9607(a). *See Control Data Corp. v. S.C.S.C. Corp.*, 53 F.3d 930, 935 & n.8 (8th Cir. 1995); *General Elec. Co. v. Litton Indus. Automation Sys., Inc.*, 920 F.2d 1415, 1417-18 (8th Cir. 1990) (courts look only to see if there has been a release or threatened release for which a defendant is responsible), *cert. denied*, 499 U.S. 937 (1991); *c.f. Farmland Indus., Inc. v. Colorado & Eastern R.R.* , 922 F.Supp. 437, 439-42 (D. Colo. 1996) (court holds § 9613(f) does not impose a separate causation element – a *prima facie* case for contribution liability is established by proving liability under § 9607); *Louisiana-Pacific Corp. v. Beazer Materials & Serv., Inc.,* 811 F.Supp. 1421, 1426-30 (E.D. Cal. 1993) (statute does not impose a causation element where defendant falls within one of four statutorily defined classes and there has been an actual release).

The district court concluded Koch was liable under CERCLA because (1) it "owned or operated" the Refinery, a facility as defined by CERCLA, and (2) during its ownership and operation, Koch released or disposed of hazardous substances, as defined by CERCLA.  The court further concluded Tosco had proven the required connection between Koch's activities and the response costs Tosco incurred.  According to the district court, Koch failed to establish any of the CERCLA defenses.  *See* 42 U.S.C. § 9607(b).

We review the district court's conclusions of law de novo, applying the same standard used by the district court in making its initial ruling.  *See Naimie v. Cytozyme Lab., Inc.*, 174 F.3d 1104, 1108 (10th Cir. 1999); *Olguin v. Lucero*, 87 F.3d 401, 403 (10th Cir.), *cert. denied*, 519 U.S. 982 (1996).  We review the district court's fact findings for clear error.[1]  *Naimie*, 174 F.3d at 1108.  "'A finding of fact is "clearly erroneous" if it is without factual support in the record or if the appellate court, after reviewing all the evidence, is left with a definite

---

[1] Koch alleges the district court adopted Tosco's proposed findings of fact verbatim, and for that reason we should review those findings "especially critically."  Having reviewed the record, we do not believe the district court mechanically adopted the prevailing party's proposed findings without reasoned consideration.  In any event, the clearly erroneous standard must still guide our review. *See Everaard v. Hartford Accident & Indem. Co.*, 842 F.2d 1186, 1193 (10th Cir. 1988).

and firm conviction that a mistake has been made.'" *Manning v. United States*, 146 F.3d 808, 812 (10th Cir. 1998) (quoting *Cowles v. Dow Keith Oil & Gas, Inc.*, 752 F.2d 508, 511 (10th Cir. 1985)).

Koch claims Tosco failed to prove Koch actually discarded a hazardous waste at the Refinery site. In particular, Koch argues the district court's findings of fact numbers 18 through 45 are erroneous and unsupported by the record. We find ample record evidence to support the district court's findings that Koch disposed of hazardous waste at the Refinery. CERCLA liability may be inferred from the totality of the circumstances; it need not be proven by direct evidence. *See United States v. Cello-Foil Prods., Inc.*, 100 F.3d 1227, 1231-32 (6th Cir. 1996) (defining the scope of CERCLA liability under 42 U.S.C. § 9607(a)(3)); *United States v. Vertac Chem. Corp.*, 46 F.3d 803, 808 (8th Cir. 1994) (determination of operator liability under 42 U.S.C. § 9607 (a)(2) is a fact-intensive inquiry requiring consideration of the totality of circumstances), *cert. denied*, 515 U.S. 1158 (1995). This is especially true under the circumstances presented in this case, as eyewitness testimony or other direct evidence concerning specific waste disposal practices at oil refineries during the 1940s – well before the enactment of environmental laws – is rarely available. It is sufficient, therefore, that Tosco presented a wealth of circumstantial evidence

showing disposals of hazardous waste occurred at the Refinery during Koch's

ownership or operation.[2]  Indeed, given the evidence of record, reviewed in its

entirety, Koch's effort to discredit the evidence in an attempt to avoid the broad

scope of CERCLA liability is disingenuous.

Koch's arguments concerning the lack of a nexus between any disposal

activity conducted by Koch and the costs Tosco has incurred, and the application

of the petroleum exclusion to wastes Koch discharged at the Refinery, are equally

meritless.  As stated above, and for obvious reasons given the nature and history

of the Refinery site, Tosco need not tie specific response costs to hazardous waste

identified as Koch's, alone.  Koch does not dispute it owned, operated or leased

out a portion of the Refinery site between 1946 and 1953.  Moreover, the record

is replete with evidence Koch used unlined ditches, pits and ponds to dispose of

---

[2]  As the district court found, and the record substantiates, Koch's refinery operations, as well as operations conducted during the period when Koch leased the Refinery to Sunray, generated numerous hazardous substances and wastes. Koch itself operated numerous unlined waste ponds and pits, oil skimming ponds, sumps, settling ponds, cooling ponds, holding ponds, and drainage ditches, and an asphalt pit area and underground pipelines for waste disposal.  In addition, numerous product and chemical spills and leaks occurred from tanks, ditches, pipelines, process units and waste areas.  All these areas are probable sources of underground contamination.  Koch's own documents indicate Koch could not account for seven percent of its daily throughput, thus evidencing a large volume of materials, including liquid phase petroleum hydrocarbons containing hazardous constituents, leaking from the process units into the environment.

hazardous waste at the site. The evidence indicates those wastes migrated from the ditches, pits and ponds, through the soil and into the groundwater, and thus are a probable source of groundwater contamination. The record further reveals the Department has identified additional areas for investigation and possible remediation, including the Refinery's northern perimeter which Koch owned for seven years, as well as waste management units Koch is known to have operated. This evidence is more than sufficient to identify Koch as a responsible person under 42 U.S.C. § 9607, and thus, demonstrate a connection between Koch's operations and waste handling practices at the Refinery and the resulting hazardous waste contamination the Department identified and Tosco has and will continue to remediate. *See Control Data Corp.*, 53 F.3d at 935 n.8.

The record similarly supports the district court's finding that hazardous wastes have commingled with the petroleum products in the soil and floating on the groundwater beneath the refinery, thus rendering the CERCLA petroleum exclusion[3] inapplicable. It is well known refineries generate hazardous wastes in addition to petroleum products. *See Cose v. Getty Oil Co.*, 4 F.3d 700, 707-09

---

[3] The definition of "hazardous substance" specifically excludes material that is "petroleum, including crude oil or any fraction thereof which is not otherwise specifically listed or designated as a hazardous substance." 42 U.S.C. § 9601(14)(D).

(9th Cir. 1993) (crude oil tank bottoms are not "petroleum" and therefore not subject to CERCLA's exclusion); *United States v. Western Processing Co.*, 761 F.Supp. 713, 721 (W.D. Wash. 1991) (EPA presumes wastes from the interior of a tank that held a petroleum product are hazardous); *see also* 40 C.F.R. §§ 261.31, 261.32 (listed, hydrocarbon-based hazardous wastes relating to refineries include API separator waste, slop oil emulsion solids, and wastewater sludge). Congress intended that the petroleum exclusion address oil spills, not releases of oil which has become infused with hazardous substances. *See Alcan Aluminum*, 964 F.2d at 266-67 (citing S.Rep. No. 848, 96th Cong., 2d Sess. 30-31 (1980)). Consequently, "'EPA does not consider materials such as waste oil to which listed CERCLA substances have been added to be within the petroleum exclusion.'" *Id.* at 266 (quoting 50 Fed. Reg. 13,460 (1985)). Sampling results and expert testimony confirm that certain soil at the Refinery, as well as the petroleum plume in the groundwater aquifer beneath the Refinery, contains a mixture of petroleum and hazardous wastes generated and disposed from numerous sources at the Refinery.[4] The petroleum exclusion requires Koch to controvert Tosco's evidence concerning the hazardous composition of the petroleum product in the soils or

---

[4] The hazardous substances present in seep and soil samples from the Refinery include heavy metals, chromium, napthalenes and phenols, dissolved benzene, toluene, ethyl benzene and xylene, chromium, arsenic, barium, cobalt, lead, nickel, and benadium.

floating on the groundwater beneath the refinery.[5] Koch presents no such

evidence,[6] and thus, has failed to demonstrate its entitlement to the exclusion.[7]

For all these reasons, we affirm the district court's conclusion Koch is obligated

to contribute to investigation and remediation costs incurred at the Refinery

pursuant to 42 U.S.C. § 9613(f).

B. Contribution Allocation

CERCLA authorizes a district court to allocate CERCLA response costs

---

[5] In any CERCLA case, once the plaintiff alleges a release or threatened release of hazardous substances, which Tosco has alleged and supported with evidence here, the party asserting the benefit of the petroleum exclusion bears the burden of proof on that issue. *See Organic Chem. Site PRP Group v. Total Petroleum Inc.*, 58 F.Supp.2d 755, 763 (W.D.Mich. 1999) (because petroleum exclusion is an exception to a statutory prohibition, the defendant bears the burden of showing the exclusion applies). For the reasons discussed above, Koch's assertion Tosco failed to establish the release of a hazardous substance and therefore Koch bears no burden to demonstrate the applicability of the petroleum exclusion is wrong.

[6] Indeed, Koch's own expert conceded he performed no testing to show unadulterated petroleum was the only contaminant in the ground water plume. Moreover, he could not opine that hazardous waste generated by Koch did not commingle with petroleum products.

[7] Koch's emphasis on the presence of petroleum product and past efforts to monitor and recover petroleum product from the ground water beneath the Refinery is of no relevance. It simply does not rebut the fact hazardous substances are commingled with the petroleum products, thus rendering the petroleum exclusion inapplicable.

among the liable parties using any equitable factors it deems appropriate. 42 U.S.C. § 9613(f). *See also FMC Corp. v. Aero Indus., Inc.*, 998 F.2d 842, 846 (10th Cir. 1993). We review the district court's contribution allocation for abuse of discretion. *FMC Corp.*, 998 F.2d at 847.

Koch complains the district court erred by allocating remediation costs based solely on the duration of Refinery operations under Koch's ownership relative to the thirty-seven-year period between 1946 and 1983. Rather than allocate Koch a fifteen percent share based on the relative period during which the Refinery was operated while under Koch's ownership, Koch argues the district court should have based Koch's fair share on the relative productive capability of each responsible party and the alleged fact Koch disposed of much of its Refinery waste off-site. Other equitable factors Koch claims the district court failed to consider when making its allocation determination include the total number of potentially responsible parties, the relative acreage controlled by each party (Koch operated on only 160 acres), and the fact that during a portion of Koch's ownership, Sun actually operated the Refinery under lease from Koch. In the end, Koch claims it should be responsible for no more than 1.5% of the total response costs.

In balancing the equities in light of the totality of the circumstances, *see FMC Corp.*, 998 F.2d at 847, the district court first determined the pollution caused by the various Refinery owners and operators has commingled and cannot be separated. The court then found Koch operated waste areas in eleven out of thirty, or thirty-seven percent, of the identified solid waste management areas at the Refinery. The court noted that waste disposal practices improved in the years subsequent to Koch's ownership and operation of the Refinery, and found it more probable than not there was a greater infiltration of contaminants into soils during Koch's operation and ownership than during subsequent years – equitable factors weighing against Koch. Finally, the court cited the absence of any evidence that the amount of waste disposed to the environment was substantially different during Koch's ownership, a period of seven years (or fifteen percent of the Refinery's operational life). Record evidence exists to support each of these findings, which placed Koch's fair share in the range of fifteen to thirty-seven percent. Accordingly, we cannot say the court abused its discretion by rejecting Koch's proposed 1.5% allocation, and instead allocating fifteen percent of the total response costs to Koch.

C. Nuisance Liability

In addition to holding Koch liable for a share of response costs under

CERCLA, the district court also held Koch liable for damages to Tosco under Oklahoma public nuisance law. Koch claims the district court erred because "[t]he unrefuted evidence establishes that no claim for statutory nuisance exists." Koch further argues Tosco's nuisance claim is barred under Oklahoma's two-year statute of limitations, and Tosco did not suffer a "special injury," as required to maintain an action for public nuisance. We address each argument in turn.

Koch first attempts to avoid liability under state law by characterizing the alleged nuisance as the existence of petroleum seeps into Claridy Creek, not the presence of petroleum hydrocarbons in the groundwater under the Refinery. According to Koch, it therefore cannot be liable because "there is no evidence that seeps of petroleum hydrocarbons, which constitute the claimed nuisance, occurred during Koch's ownership or operation of its portion of the Refinery." The evidence as Koch relates it "establishes that the petroleum hydrocarbon seeps were first observed in the early 1970s by Sun and that those seeps were abated by Sun's installation and operation of the petroleum hydrocarbon recovery system." Only later was the abatement discontinued and did the seeps recur. In sum, Koch denies it ever committed any unlawful acts or failed to perform any duties required by the law in effect at the time it owned and operated the Refinery, which acts or omitted duties caused the alleged nuisance. We disagree.

First, Koch cites no legal authority or factual evidence to support its claim that seeps of polluted groundwater into Claridy Creek constitute a public nuisance, but the presence of hydrocarbons in the groundwater does not. We fail to see how the Oklahoma Department of Environmental Quality's reference to the seeps as a public nuisance in any way limits legal liability to that particular aspect of the nuisance. The pollution of any Oklahoma waters, including groundwater, has been prohibited by state statute since the early 1900s – well before Koch's waste disposal activity at the Refinery. As illustrated above, there is ample record evidence establishing Koch disposed of hazardous wastes that have percolated through the soils and into the groundwater beneath the Refinery. The groundwater is hydrologically connected to the Creek as evidenced by the seeps. Consequently, Koch's denial of any unlawful activity *vis à vis* water pollution and the public nuisance stemming therefrom rings hollow.

We also reject Koch's argument Tosco's nuisance claim is barred by a two-year statute of limitations. While the statute of limitations on private nuisance claims under Oklahoma law is two years, *see N.C. Corff Partnership, Ltd. v. OXY USA, Inc.*, 929 P.2d 288, 293 (Okla. App. Div. 4 1996), Okla. Stat. tit. 50, § 7 provides: "No lapse of time can legalize a public nuisance amounting to an actual obstruction of public right." Concluding, as we have here, that the pollution of

Oklahoma waters constitutes a public nuisance under Oklahoma law, the district court of the Western District of Oklahoma, in *Fischer v. Atlantic Richfield Co.*, 774 F.Supp. 616 (W.D. Okla. 1989), applied Okla. Stat. tit. 50, § 7 to disallow the two-year statute of limitations as a defense against a plaintiff seeking pollution abatement or the costs of abatement. *Id.* at 619. We see no reason to reject this existing interpretation of Oklahoma law.

Finally, we agree with the District Court Tosco adequately proved it suffered a "special injury" sufficient to maintain a cause of action under Okla. Stat. tit. 50, § 10 by establishing it has borne the entire cost of investigation and remediation at the Refinery. *See Westwood Pharm., Inc. v. National Fuel Gas Distrib. Corp.,* 737 F.Supp. 1272, 1281 (W.D.N.Y. 1990) (holding that if Westwood can establish it has incurred response costs consistent with the National Contingency Plan, those costs will be sufficient to meet the special injury criterion for bringing a public-nuisance action).

D. Evidence

Koch asserts the district court "abused its discretion by admitting the results of scientific tests that Tosco conducted after the discovery cut-off and disclosed to Koch, for the first time, after the pretrial conference, on the eve of

trial." The specific evidence to which Koch objects is data from soil and groundwater sampling conducted in December 1997 as part of the remedial investigation and feasibility study performed pursuant to Tosco's consent agreement with Oklahoma Department of Environmental Quality. Koch claims it was unfairly prejudiced by the introduction of this sampling data because it was unable to conduct additional discovery prior to trial.

We will not disturb the district court's evidentiary ruling unless we have a definite and firm conviction the court made a clear error of judgment or exceeded the bounds of permissible choice under the circumstances. *McEwen v. City of Norman*, 926 F.2d 1539, 1553-54 (10th Cir. 1991). Moreover, in bench trials "questions raised relative to the admission or exclusion of evidence ... become relatively unimportant," because the rules of evidence are "intended primarily for the purpose of withdrawing from the jury matter which might improperly sway the verdict." *United States v. Norman T.*, 129 F.3d 1099, 1107 (10th Cir. 1997) (quotation marks and citations omitted), *cert. denied*, 523 U.S.1031 (1998). Where, as here, a case is tried before the court without a jury, we presume on appeal the court considered only competent evidence and disregarded any incompetent evidence. *Id.*

Koch fails to overcome that presumption or demonstrate any abuse of discretion or prejudice. The sampling evidence Koch complains of was scheduled and conducted as part of Tosco's ongoing remedial investigation and feasibility study at the Refinery. The record indicates Koch was aware no later than November 1997 Tosco would be conducting sampling in December 1997, after the discovery cut-off, and Tosco intended to present the results of such testing in the trial. Koch never requested to observe the sampling, take its own samples, or split any samples collected. Instead, Koch filed a motion in limine to exclude the sampling data the end of January 1998, after the court's deadline for filing such motions, in part on the ground Tosco allegedly denied then co-defendant Sun's request for split samples. Yet, Koch makes no showing it had access to or otherwise was relying on any split samples Sun might obtain. Koch makes no claim Tosco failed to produce the data as soon as it became available. More important, Koch makes no showing the data is unreliable or Koch was denied an adequate opportunity to cross-examine witnesses at trial concerning the December 1997 data. Under these circumstances, we affirm the district court's evidentiary ruling.

E. Previous Settlement

Koch argues the district court "erred by not taking into consideration the

fact of the Sun/Tosco settlement in connection with Koch's liability to Tosco."

According to Koch, the district court was obligated to conduct a "fairness hearing" on the amount of that settlement so that Koch, as a non-settling defendant, could be credited with the amount of the settlement. Otherwise, Koch claims Tosco will realize a windfall by recovering more than it is entitled to in contribution (*i.e.*, more than the investigation and remediation costs Tosco has or will incur).

Koch's argument is factually flawed and without legal support. The record makes clear the district court allocated liability for past and future response costs proportionately among the responsible parties – expressly as to Koch and implicitly as to Sun and Tosco – thus avoiding making Koch responsible for more than its fair share. Sun opted to settle its liability for a fixed amount in order to avoid the uncertainty of unknown future costs. Koch chose not to settle for a fixed amount. We believe where, as here, a responsible party chooses to go to trial and future response costs are likely to be incurred, but the exact amount remains unknown, a judgment on proportional liability is an appropriate remedy. *See Kelley v. E.I. DuPont de Nemours & Co.*, 17 F.3d 836, 844-45 (6th Cir. 1994) (a declaration of liability is appropriate even if future costs are somewhat speculative). In other words, the district court was not obligated to fix an amount

of Koch's liability based on the Sun/Tosco settlement. As noted above, the district court acted well within its discretion by allocating Koch's proportionate share of liability based on Koch's relative duration of Refinery ownership and control – a factor unique to Koch and unaffected by a settlement between other responsible parties. Moreover, the majority of courts deciding contribution suits between private parties under 42 U.S.C. § 9613(f)(1) (as contrasted from suits or settlements with the government under 42 U.S.C. § 9613(f)(2)), have applied the Uniform Comparative Fault Act to reduce a nonsettling party's liability by the amount of the settling parties' liability, not the settlement amount. Lynnette Boomgaarden & Charles Breer, *Surveying the Superfund Settlement Dilemma*, 27 Land & Water L.Rev. 84, 109-12 & note 189 (1992). Koch cites no persuasive legal authority to the contrary, no authority for its proposition the district court was obligated to conduct a "fairness hearing" on the terms of the Sun/Tosco settlement,[8] and no evidence Tosco will enjoy a windfall. Koch's assertion Tosco may receive double recovery is pure speculation. Consequently, we will not overturn the district court's judgment on this ground.

---

[8] We note in the context of settlement with the EPA pursuant to 42 U.S.C. § 9613(f)(2), courts consistently have rejected any right to a fair share hearing prior to judicial approval of the settlement. *See* Boomgaarden & Breer, *supra*, at 107-08 & note 171.

III.  Conclusion

For all the foregoing reasons, the district court's judgment imposing contribution liability on Koch under CERCLA and Oklahoma law is **AFFIRMED**. Tosco's request for attorney fees and costs pursuant to 28 U.S.C. § 1912 and Fed. R. App. P. 38 and 39 is denied.